IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY H. SACHS, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 06 C 1119 |
| | ) | |
| REEF AQUARIA DESIGN, INC., a Florida corporation; JEFFREY TURNER, an individual, | ) ) ) ) | Judge Ronald A. Guzmán |
| | ) | |
| Defendants | ) | |
| | ) | |
| REEF AQUARIA DESIGN, INC. and JEFFREY TURNER, | ) ) ) | |
| | ) | |
| Third-party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| D&D AQUARIUM SOLUTIONS, LTD. and DAVID SAXBY, an individual, | ) ) ) | |
| | ) | |
| Third-party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Gregory H. Sachs ("Sachs") and Chubb National Insurance Co. as his subrogee have sued Reef Aquaria Design, Inc. ("Reef Aquaria") and Jeffrey Turner for breach of contract, breach of express and implied warranty of workmanship and negligence relating to an aquarium that failed and released 2,800 gallons of water into Sachs' home. Reef Aquaria then sued third-party defendants D&D Aquarium Solutions, Ltd. ("D&D") and David Saxby for contribution. Before the Court is D&D and Saxby's motion for a finding that Sachs, D&D and Saxby have reached a

settlement in good faith and to dismiss with prejudice Reef Aquaria and Turner's third-party complaint against D&D and Saxby. For the reasons provided in this Memorandum Opinion and Order, the Court finds that the settlement was made in good faith. Accordingly, the Court dismisses with prejudice Reef Aquaria and Turner's third-party complaint against D&D and Saxby for contribution.

## Facts

In February 2004, Sachs entered into an agreement with defendants to design and install a 2,800 gallon, all-glass aquarium system in Sachs' residence. (Am. Compl. ¶ 12.) In December 2004, plaintiff allegedly noticed that the front and back glass panels in a portion of the aquarium were bowing and the supporting brace had come loose from the top of the aquarium. (*Id.* ¶ 18.) On or about December 3, 2004, Sachs attempted to contact Turner regarding the problems, and Turner did not respond. (*Id.* ¶ 22.) Five days later, Sachs' counsel sent a letter to defendants notifying them of the problems. (*Id.* ¶ 23.)

Sachs hired non-party Klein & Hoffman, Inc. ("KHI"), a structural engineering firm, to inspect the aquarium and provide recommendations for restoring its structural integrity. (*Id.* ¶ 25.) On December 23, 2004, KHI reported that the compromised structural integrity of the aquarium resulted from, among other things: (1) a failure of one of the aquarium's tension strut connections; (2) a design that relied entirely upon sealant as a tension connector; and (3) the use of glass members for the aquarium's tension struts, which may have relied too heavily on the glass's tension capacity. (*Id.* ¶ 26.) On January 10, 2005, Sachs' counsel sent defendants KHI's report, invited Reef Aquaria to arrange for its own investigators, adjusters or examiners to inspect the aquarium and asked Reef Aquaria to contact Sachs or his counsel no later than

January 21, 2005 to arrange for such an inspection. (*Id.* ¶ 27.) Neither Turner nor Reef Aquaria notified Sachs or his counsel of any intent to inspect the aquarium by that date. (*Id.* ¶ 29.)

In late January 2005, Sachs contacted Turner to discuss Sachs' intention to drain the aquarium and install additional bracing based on KHI's recommendation. (*Id.* ¶ 30.) Turner stated that such a draining was unnecessary and additional bracing would remedy the problem. (*Id.*)

Sachs then hired Saxby of D&D Aquarium Solutions Ltd. to inspect the system and provide a recommendation for fixing the structural integrity of the aquarium. Saxby provided Sachs with a written report indicating that the aquarium needed to be drained. (*Id.* ¶¶ 32-34.) Saxby, who lives in England, is a friend of Sachs, stayed at Sachs' home several times and socialized with Sachs during Sachs' visit to England. (Defs.' Resp. Joint Mot. Good Faith Finding & Dismiss, Ex. E, Saxby Dep. at 193; *Id.*, Ex. F, Saxby Dep. at 10, 25-26.)

Though KHI and Saxby recommended that the aquarium be drained, Turner maintained that only minimal remedial measures were required to restore its structural integrity. (Am. Compl. ¶ 35.) Based on the recommendations of KHI and Saxby, Sachs decided to drain the aquarium and have more substantial bracing installed to support the structure before refilling it and notified defendants of the remedial measures being taken. (*Id.* ¶¶ 36, 38.)

In March 2005, Saxby and D&D implemented these remedial measures, reinstalled live rock in the aquarium and refilled it with water. (*Id.* ¶ 39.) Two hours after the aquarium was refilled completely, a leak was discovered in a crack in the bottom of the tank. (*Id.* ¶ 40.) As a result of this leak, the entire 2,800 gallons of water suddenly and calamitously drained from the tank and into Sachs' home. (*Id.*)

Afterwards, Sachs inspected the aquarium and discovered that: (1) defendants had used

3

three-quarter inch glass for the bottom of the aquarium, rather than the one-inch glass that had been specified in the agreement; (2) the stand for the aquarium was not bolted together as a solid structure and did not have an adequate number of legs for the amount of weight to be supported; (3) as a result of these flaws, it was not possible for Reef Aquaria to shim the tank stand during construction to ensure that the tank would be level and consequently, Turner was required to place shims under the platform of the tank, which in turn created a pressure point that eventually produced the crack that led to the aquarium's failure. (*Id.* ¶ 43.)

Sachs' insurance company, Chubb, hired its own expert, non-party Exponent Failure Analysis ("EFA"), to inspect, and investigate the failure of, the aquarium. (*Id.* ¶ 44.) EFA reported that the initial design of the aquarium did not appropriately consider stress concentrations at penetrations in the glass, and the cracking in the glass panel likely began under normal, full-tank operating conditions. (*Id.* ¶ 46.) EFA also concluded that the cracking was due to the fact that the normal loading of the aquarium (water, sand, rocks) produced excessive stresses in the bottom glass plate and that these stresses caused a small crack to form and grow in the bottom plate. (*Id.* ¶ 47(a).) According to EFA, the cracking occurred at one of the circular holes (part of the original design) cut in the bottom plate (made out of three-quarter inch annealed glass) to allow passage of various pipes into the aquarium. (*Id.* ¶ 47(b).) EFA also reported that the bottom of the aquarium was made of a glass plate over a layer of rigid foam insulation and a layer of plywood and thus, no load was transferred to the plywood and the bottom plate carried the entire load of the water, sand and rocks in the aquarium. (*Id.* ¶ 47(c).) EFA's report also indicated that the act of draining and refilling the aquarium, the weight of a person walking on the bottom plate after the tank was drained, the bowing and warping of the tank's glass panes and other problems that led to the draining of the tank did not contribute to the

4

failure of the aquarium. (*Id.* ¶ 50.)

## Discussion

When a trial court is notified that a settlement has been reached and is asked to determine the good faith nature of the settlement, the court "should rule on the good faith of the settlement as soon as practicable, apart from and in advance of any trial on the tort issues." *Johnson v. United Airlines*, 784 N.E.2d 812, 818 (Ill. 2003) (citing *Barreto v. City of Waukegan*, 478 N.E.2d 581, 588 (Ill. App. Ct. 1985)). Upon finding that the settlement was reached in good faith, the trial court should dismiss any claims for contribution against the settling defendant. *Banovz v. Rantanen*, 649 N.E.2d 977, 984 (Ill. App. Ct. 1995).

The Joint Tortfeasor Contribution Act creates a statutory right of contribution in actions "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death," 740 Ill. Comp. Stat. 100/1, 2(a), to the extent that a tortfeasor pays more than his pro rata share of the common liability. 740 Ill. Comp. Stat. 100/2(b). No contribution may be obtained by or from a tortfeasor with whom the injured party has settled in good faith. 740 Ill. Comp. Stat. 100/2(d). The good faith of a settlement is the only limitation placed on the right to settle. *Dubina v. Mesirow Realty Dev., Inc.*, 756 N.E.2d 836, 840 (Ill. 2001); *In re Guardianship of Babb*, 642 N.E.2d 1195, 1199 (Ill. 1994).

To evaluate whether a settlement was made in good faith, a court may consider: (1) "whether the amount paid by the settling tortfeasor was within a reasonable range of the settlor's fair share;" (2) "whether there was a close personal relationship between the settling parties;" (3) "whether the plaintiff sued the settlor;" and (4) "whether a calculated effort was made to conceal information about the circumstances surrounding the settlement agreement." *Wreglesworth v.*

5

*Arctco, Inc.*, 740 N.E.2d 444, 449 (Ill. App. Ct. 2000) (quotations and citations omitted). "No single factor is seen as determinative." *Id.* Illinois courts consistently hold that it is unnecessary for a trial court to conduct separate evidentiary hearings, decide the merits of the tort case, or rule on the relative liabilities of the parties before making a good faith determination. *See Johnson*, 784 N.E.2d at 824; *Smith v. Texaco, Inc.*, 597 N.E.2d 750, 755 (Ill. App. Ct. 1992); *Ruffino v. Hinze*, 537 N.E.2d 871, 874 (Ill. App. Ct. 1989); *Barreto*, 478 N.E.2d at 588.

"[T]he settling parties carry the initial burden of making a preliminary showing of good faith." *Johnson*, 784 N.E.2d at 820. Then the party challenging the good faith of the settlement must prove the absence of good faith by a preponderance of the evidence. *Id.*

To satisfy the burden of making a preliminary showing of good faith, the settlors must "show the existence of a legally valid settlement agreement." *Id.* A settlement agreement is a contract. *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 713 F.2d 319, 321 (7th Cir. 1983). Thus it must have three components: (1) offer, (2) acceptance, and 3) consideration. *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977). In some cases, settlements involving the exchange of consideration have been held to be *prima facie* valid and, therefore, were presumed to be in good faith. *Johnson*, 784 N.E.2d. at 819 (citing *Wreglesworth*, 740 N.E.2d at 448-49; *Solimini v. Thomas*, 688 N.E.2d 356, 361 (Ill. App. Ct. 1997); *McDermott v. Metro. Sanitary Dist.*, 607 N.E.2d 1271, 1297 (Ill. App. Ct. 1992)). However, not all legally valid settlements satisfy the "good faith" requirements of the Joint Tortfeasor Contribution Act. *Id.* at 820 (citing *Stickler v. Am. Augers, Inc.*, 757 N.E.2d 573, 577-78 (Ill. App. Ct. 2001); *Stickler v. Am. Augers, Inc.*, 708 N.E.2d 403, 406 (Ill. App. Ct. 1999); *Bower v. Murphy & Miller, Inc.*, 650 N.E. 2d 608, 611 (Ill. App. Ct. 1995)). Therefore,

"other factual evidence may be necessary before the court may determine, as an initial matter, whether the settlement is fair and reasonable in light of the policies underlying the Contribution Act." *Id.* The two important underlying public policies of the Joint Tortfeasor Contribution Act are the promotion of peaceful settlements and the equitable apportionment of the damages. *Id.* at 821; *Dubina*, 756 N.E.2d at 840-41; *Babb*, 642 N.E.2d at 1203.

In *Johnson v. United Airlines*, the Illinois Supreme Court upheld the trial court's finding of *prima facie* good faith where a settlement was supported by consideration and the evidence indicated that both parties rationally made informed decisions to enter the agreement. 784 N.E.2d at 822. Similarly, the settlors in the instant case have established that the settlement agreement is *prima facie* valid and entered into in good faith because the evidence indicates that it is reached voluntarily and is based on informed decisions. In exchange for $85,000.00, Sachs has agreed to release D&D and Saxby from any and all future claims, actions, suits, obligations, liabilities and demands of any character whatsoever relating to or arising out of this litigation. (Settlors' Ex. A, ¶ 1.) When the parties entered into the settlement, they had an understanding of the relative culpability of D&D and Saxby and the likelihood of recovery. Co-plaintiff Chubb, Sachs' insurer, who has no affiliation with D&D or Saxby and had every incentive to identify anyone party liable for the failure of the aquarium, hired its own expert, EFA, to inspect, and investigate the failure of, the aquarium. (Am. Compl. ¶ 44.) EFA reported that the initial design of the aquarium did not appropriately consider stress concentrations at penetrations in the glass, and the cracking in the glass panel likely began under normal, full-tank operating conditions. (*Id.* ¶ 46.) EFA also concluded that the cracking was due to the fact that the normal loading of the aquarium (water, sand, rocks) produced excessive stresses in the bottom glass plate and that these stresses caused a small crack to form and grow in the bottom plate. (*Id.* ¶ 47(a).)

7

According to EFA, the cracking occurred at one of the circular holes (part of the original design) cut in the bottom plate (made out of three-quarter inch annealed glass) to allow passage of various pipes into the aquarium. (*Id.* ¶ 47(b).) EFA's report also indicated that the acts of draining and refilling the aquarium, the weight of a person walking on the bottom plate after the tank was drained, the bowing and warping of the tank's glass panes and other problems that led to the draining of the tank did not contribute to the failure of the aquarium. (*Id.* ¶ 50.) EFA's report, together with the general uncertainty of litigation, provide a good faith basis for the settlement between Sachs, D&D and Saxby.

Because the settlors have satisfied their burden of making a preliminary showing of good faith, the burden shifts to Reef Aquaria and Turner to show by a preponderance of the evidence that the settlement was not reached in good faith. This they have failed to do.

A settlement is not in good faith if it is shown that the settling parties engaged in collusion, fraud, unfair dealing, or wrongful conduct by the settling parties. *Dubina*, 756 N.E.2d at 840; *Babb*, 642 N.E.2d at 1199; *Lowe v. Norfolk & Western Ry. Co.*, 463 N.E.2d 792, 804 (Ill. App. Ct. 1984). In addition, a settlement does not satisfy the good-faith requirement if it is inconsistent with the policies underlying the Joint Tortfeasor Contribution Act, *i.e.*, the promotion of peaceful settlements and the equitable apportionment of the damages. *Dubina*, 756 N.E.2d at 840; *Babb*, 642 N.E.2d at 1204; *Johnson*, 784 N.E.2d at 821.

Reef Aquaria and Turner argue that the settlement is not in good faith because (1) Sachs has a personal relationship with D&D's principal, Saxby, and (2) the $85,000.00 settlement amount does not represent an equitable apportionment of damages. First, the fact that Sachs may have had a personal relationship with Saxby does not explain or negate the conclusions of EFA, a firm hired by Chubb, which, as discussed above, had every incentive to determine precisely

8

who was responsible for the aquarium's failure. Reef Aquaria and Turner do not argue that the EFA report is somehow tainted by Sachs' relationship with Saxby.

Second, as discussed above, the Chubb report provides a basis for the settlors' decision that the $85,000.00 settlement reflects D&D and Saxby's fair share of the damages in this case. That Reef Aquaria and Turner's experts disagree with the Chubb report and its conclusions does not establish by a preponderance of the evidence that the settlement was not in good faith for there will always be tremendous disagreement between experts in cases such as this. Contrary to Reef Aquaria and Turner's assertions otherwise, the Court finds nothing suspicious about the timing of the settlement negotiations, which were taking place prior to September 19, 2007 (Pls.' Reply, Ex. B, Email of 9/19/07 from R. Arnold to P. Walker-Bright) and Magistrate Judge Keys' ruling of October 25, 2007, in which he denied plaintiffs' motion to exclude the testimony of defendants' experts. Reef Aquaria and Turner have not established that it is more likely than not that this settlement contravenes the policy concern of equitable apportionment of damages.

Further, recognizing this agreement as being made in good faith encourages settlements. "[N]othing is better calculated to frustrate and discourage settlements than the knowledge that the settlement lacks finality and will lead to further litigation and perhaps, to further liability." *Perez v. Espinoza*, 484 N.E.2d 1232, 1235 (Ill. App. Ct. 1985). The settlement in the current case enables Sachs, D&D and Saxby to put their resources to best use according to their own judgment. In sum, the Court finds that Sachs, D&D and Saxby have reached a good faith settlement in this case. Reef Aquaria and Turner simply have not sustained their burden of establishing by a preponderance of the evidence that the settlement agreement between Sachs, D&D and Saxby is the result of collusion, fraud, unfair dealing or wrongful conduct or subverts the underlying policies of the Joint Tortfeasor Contribution Act. Accordingly, Reef Aquaria and

9

Turner's third-party complaint against D&D and Saxby for contribution is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants D&D and Saxby's motion for a finding that Sachs, D&D and Saxby have reached a settlement in good faith and motion to dismiss with prejudice Reef Aquaria and Turner's third-party complaint against D&D and Saxby [doc. nos. 177-1, 177-2]. D&D and Saxby are hereby terminated as parties to this action.

**SO ORDERED**         ENTERED: 3/20/08

HON. RONALD A. GUZMAN
United States Judge